UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

DEBORAH RENEE ROBINSON

    Plaintiff,

v.                                          Case No. 17-cv-1750-pp

TAMARA CROUTHER-TOLE, *et al.*,

    Defendants.

---

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT NO. 43) AND DISMISSING CASE**

---

On December 15, 2017, the plaintiff, representing herself, filed this lawsuit under 42 U.S.C. §1983, alleging that the defendants violated her constitutional rights. Dkt. No. 1. On August 30, 2018, the court received from the plaintiff an amended complaint. Dkt. No. 13. The court screened the complaint and allowed the plaintiff to proceed on an Eighth Amendment deliberate-indifference-to-medical-needs claim and an Eighth Amendment conditions-of-confinement claim. Dkt. No. 20. The court also exercised supplemental jurisdiction over a negligence claim under Wisconsin state law. Id.

The defendants since have filed a motion for summary judgment. Dkt. No. 43. The court will grant the defendants' motion and dismiss the case.

1

## I. Relevant Facts

### A. Preliminary Procedural Matters

In their reply brief, the defendants contend that the plaintiff did not follow Federal Rule of Civil Procedure 56 or Civil Local Rule 56 because she did not respond to defendants' proposed findings of fact or file any supporting affidavits, declarations or other admissible evidentiary materials. Dkt. No. 61 at 1. They argue that this failure entitles them to summary judgment as a matter of law. Id. at 2.

While *pro se* parties—those proceeding without a lawyer, like any other parties, are required to comply with federal and local procedural rules, district courts are entitled to take "a . . . flexible approach;" they have the discretion to "overlook[] . . . noncompliance" and construed whatever materials the plaintiff submits in the light most favorable to her. Gray v. Hardy, 826 F.3d 1000, 1005 (7th Cir. 2016). "[A] verified complaint—signed, sworn, and submitted under penalty of perjury—can be considered 'affidavit material' *provided* the factual allegations otherwise satisfy the affidavit criteria specified in Rule 56 of the Federal Rules of Civil Procedure *and* the declarant complies with 28 U.S.C. § 1746, which sets forth the requirements for verification under penalty of perjury." James v. Hale, 959 F.3d 307, 314 (7th Cir. May 14, 2020) (citing Ford v. Wilson, 90 F.3d 245, 247 (7th Cir. 1996)). Section 1746 requires language such as "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct," along with a date and a signature. The last page

2

of the plaintiff's original complaint states, "I declare under penalty of perjury that the foregoing is true and correct," is dated December 12, 2017 and bears the plaintiff's signature. Dkt. No. 1 at 5. The court has the discretion to treat that verified complaint as an affidavit. The court also has the plaintiff's sworn testimony from her deposition. The court will consider the information from the original complaint and the plaintiff's deposition in deciding the defendants' motion.

B. <u>The Parties</u>

The amended complaint identified only John and Jane Doe prison staff. Dkt. No. 13 at 1. The court instructed the plaintiff to use discovery to learn the real names of the Doe defendants and to file a motion seeking to substitute the real names once she learned them. Dkt. No. 20. The plaintiff filed that motion on May 8, 2019, dkt. no. 30, and the court granted it on June 13, 2019, dkt. no. 31. The plaintiff identified Tamara Crouther-Tole and William Glazer as the Milwaukee Secure Detention Facility ("MSDF") officers on duty at the time of her fall on September 19, 2017. Dkt. No. 31 at 1. She named Registered Nurse Jennifer Vaughn, Nurse Practitioner Dmitriy Chester and Dr. Prapti Kuber as the Health Services Unit ("HSU") staff on duty on September 19, 2017. <u>Id.</u> She named Sergeants Eric Leighton and Eric Olson as the sergeants on duty on September 19. <u>Id.</u> In her deposition, the plaintiff testified that she really did not know the identities of the officers and HSU staff with whom she interacted on September 19, and that she was relying on the information she received from

3

the defendants in response to her discovery requests seeking to identify the John Doe defendants. Dkt. No. 56-2 at 5; Dep. Tr. 16:4-21.

The defendants note that on September 19, 2017, Sergeant Leighton and Officer Glanzer were on duty during the first shift, from 6:00 a.m. to 2:00 p.m. Dkt. No. 45 at ¶2. Sergeant Olson and Officer Crouther-Tole were on duty during the second shift, from 2:00 p.m. to 10:00 p.m. Id. Nurse Vaughn's shift ended at 3:30 p.m. that day, and NP Chester's shift ended at 4:00 p.m. Id. at ¶¶3-4. Dr. Kuber was on call on September 19. Id. at ¶5.

### C. Allegations Related to The Plaintiff's Fall

During lunchtime on September 19, 2017, around approximately 11:00 a.m., the plaintiff retrieved her lunch tray and went to get ice from the ice machines. Dkt. No. 56-2 at 3; Dep. Tr. 8:12-16. She slipped on water that had leaked from the machine. Id.; Dep. Tr. 8:16-19. Officer Glanzer did not witness the plaintiff's fall, but once he learned of it, he immediately reported it to Sergeant Leighton. Dkt. No. 45 at ¶8. Leighton contacted HSU, and Nurse Vaughn arrived to attend to the plaintiff. Id. at ¶9. Vaughn examined the plaintiff, noting that the plaintiff was able to move her right knee, but that she could not bear weight on it. Id. at ¶11. Vaughn also noted that the knee was swollen. Id. The plaintiff states that she begged Vaughn to call an ambulance and that her knee was "severely swollen and red." Dkt. No. 1 at 2-3 (attesting that she begged "staff" to call an ambulance and stating that she heard and felt the bone in her leg break); Dkt. No. 56-2 at 4; Dep. Tr. 11:4-7.

Vaughn states she wrapped the plaintiff's wrist and knee with ace bandages and arranged to have the plaintiff taken to her cell. Dkt. No. 45 at ¶12. The verified complaint asserts that the plaintiff's pleas for help were denied and that she was left to sit in a cell in a plastic chair, unable to move. Dkt. No. 1 at 3. It states that she wet herself several times, and that "after continually crying out to staff" she was taken for x-rays at 5:00 p.m. Id. The plaintiff stated in her deposition that Vaughn gave her one icepack and had two fellow inmates, Antwonisha Reese and Regina Paskel, take her back to her cell. Dkt. No. 56-2 at 2; Dep. Tr. 11:10-12:4.

Once the plaintiff was in her cell, Vaughn consulted with Nurse Practitioner Chester, who "authorized ice and elevation, crutches or a wheelchair, ibuprofen for pain, and x-rays." Dkt. No. 45 at ¶14. During her deposition, the plaintiff did not dispute that she was given ice and over-the-counter pain medication. Dkt. No. 56-2 at 4; Dep. Tr. 12:6. She also stated at the deposition that she "kept asking them, please call me an ambulance; it's broken. Please call me an ambulance." Id. at 6; Dep. Tr. 19:17-21. The original complaint also asserts that she repeatedly called for help. Dkt. No. 1 at 3.

After consulting with Vaughn, Chester decided that the plaintiff did not need to go to the emergency room "at that time because there was no report of head injury or loss of consciousness, no chest pain or shortness of breath" and the plaintiff's pulse and blood pressure "were within stable and desirable limits." Dkt. No. 45 at ¶15. Because MSDF did not have on-site x-ray

5

capabilities, HSU had to contact the outside x-ray vendor to come to the prison with a portable x-ray machine to take the plaintiff's x-rays. Id. at ¶16.

While waiting for x-rays, the defendants state that Officer Crouther-Tole had the plaintiff write a statement about the incident. Id. at ¶21. The plaintiff testified at her deposition that she did not recall the name of the female officer who came to get her statement, but she noted that immediately after the two other inmates moved her into her cell, that officer came with a pen to have the plaintiff write her statement. Dkt. No. 56-2 at 7; Dep. Tr. 24:20-24. She saw this officer again five minutes later when she came back to retrieve the plaintiff's written statement. Id. at 8; Dep. Tr. 26:4-6. After that, the plaintiff states that she did not see anyone until five hours later when someone, whose name she does not recall, came to take her to get an x-ray. Id. at 7-8; Dep. Tr. 24:25-25:6. The plaintiff did not tell the officer who took her statement how she was feeling or indicate that she needed more than the ice and over-the-counter pain medication she received. Id. at 8; Dep. Tr. 25:8-10.

The defendants state that Sergeant Olson's role in the events of September 19 was limited. When Olson started his shift at 2:00 p.m., he reviewed the unit logbook and learned that the plaintiff fell near the ice machine. Dkt. No. 45 at ¶20. He also learned that the morning shift had called HSU, whose staff responded to the incident. Id. At 3:30 p.m., Olson himself contacted HSU to "confirm they were aware of [the plaintiff's] situation." The HSU staff member with whom Olson spoke informed Olson that they were

6

waiting for the ability to take x-rays. Id. at ¶23. The record does not indicate whether Olson and the plaintiff had any direct interaction that day.

While the plaintiff asserts that for a five-hour period, MSDF staff ignored her while she was in pain, she testified at her deposition that she did not alert MSDF staff that she needed anything. Id. at 4; Dep. Tr. 12:11-12. She stated that she could not alert the officers because to get the officers' attention she would have had to move to the door, which she could not do because of her injury. Id. at 8; Dep. Tr. 25:10-13. While the plaintiff's cellmate was in the cell with her much of the time, the plaintiff had her cellmate ask only about getting the plaintiff an ambulance. Id. at 7; Dep. Tr. 22:3-10. The officers told her cellmate that they could not get an ambulance without the permission of HSU staff and that they were waiting on HSU authorization. Id.; Dep. Tr. 22:8-21. The plaintiff testified that she did not have her cellmate alert the officers to her extreme pain or ask for more ice or pain medication because she was "not interested in a new icepack" and "needed real pain medication." Id. at 9; Dep. Tr. 29:11-21.

The plaintiff also alleges that at some point during that five-hour wait for x-rays, she soiled herself. Id. at 11; Dkt. No. 1 at 3; Dep. Tr. 37:1-3. Her cellmate was in the cell at the time she realized she needed to use the bathroom, but because of the size of the cell, her cellmate could not help get her to the toilet. Id.; Dep. Tr. 37:13-22. Neither the plaintiff nor her cellmate alerted the officers that the plaintiff needed to use the bathroom or that she

7

needed help accessing the bathroom. Id.; Dep. Tr. 37:23-38:3.

At approximately 4:45 p.m., someone (it is not clear who) came and escorted the plaintiff to HSU for x-rays. Dkt. No. 45 at ¶24. The plaintiff does not recall the name of this individual. Dkt. No. 56-2 at 11; Dep. Tr. 38:12-21. The defendants note that Nurse Rodriguez (not a defendant) was the nurse on duty at the time the plaintiff arrived at HSU for x-rays. Dkt. No. 45 at ¶25. The plaintiff states that she informed the individual who escorted her to HSU that her pants were wet, but that that person did nothing. Dkt. No. 56-2 at 11; Dep. Tr. 38:7-17. The plaintiff did not remember telling the officers when she got back from the HSU that her pants were wet, stating "it was apparent. It was obvious my pants were wet." Id.; Dep. Tr. 38-22:25. Also, the plaintiff admitted in her deposition testimony that telling the officers "would have kind of been useless. It wasn't like I could have gotten [the pants] off, you know, like I could stand up. Because they cut them off at the hospital." Id.; Dep. Tr. 39:4-7.

The x-rays came back at 6:53 p.m. Dkt. No. 45 at ¶27. Rodriguez called Dr. Kuber to review them. Id. After reviewing the x-rays, Kuber authorized the plaintiff to go to the hospital for treatment. Id. at ¶28. At 7:30 p.m., HSU called Olson explaining that the x-ray showed fractures, and that the plaintiff needed to go to the hospital. Id. at ¶29. Half an hour later, MSDF staff arrived at the plaintiff's cell to take her to the hospital. Dkt. No. 56-2 at 4; Dep. Tr. 12:22-25. The plaintiff again asked for an ambulance; instead they put her in a wheelchair and made her get in a facility vehicle. Id. at 5; Dep. Tr. 13:1-6. To

8

get into the vehicle, the plaintiff stated in the original complaint and in her deposition that she had to walk on her injured leg. Id.; Dkt. No. 1 at 3.

The plaintiff was taken to Aurora Sinai Medical Center, where she had surgery and stayed for about a week and a half. Id. at 11; Dep. Tr. 39:13-15. She was then taken either to Waupun or Dodge Correctional to the infirmary to recover for three weeks before returning to MSDF. Id.; Dep. Tr. 40:1-10. The plaintiff received pins and screws in her leg. Id. at 12; Dep. Tr. 42:8-13. She stated in her deposition that she still has trouble going up and down stairs, and that she can't run. Id. at 14; Dep. Tr. 49:7-8.

The plaintiff filed an inmate complaint with the Inmate Complaint Review System on October 13, 2017. Dkt. No. 45 at ¶32. On January 10, 2018, she also served the Wisconsin Attorney General with a notice of claim regarding the fall, but the notice of claim did not identify any defendants. Id. at ¶33.

**II.     Discussion**

    A.     Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." Anderson, 477 U.S. at 248. A

9

Case 2:17-cv-01750-PP   Filed 09/25/20   Page 9 of 20   Document 62

dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

  B.  <u>Deliberate Indifference to Serious Medical Need</u>

  The plaintiff claims that the defendants violated her Eighth Amendment rights when they failed to call an ambulance and take her to the hospital immediately after her fall. A prison official violates the Eighth Amendment where he is deliberately indifferent "to serious medical needs of prisoners." <u>Estelle v. Gamble</u>, 429 U.S. 97, 104 (1976). "To state a valid deliberate-indifference claim, [the plaintiff] need[s] to allege that the defendants knew about, but disregarded, a serious medical need." <u>Conner v. Schwenn</u>, No. 20-1728, 2020 WL 5530301, at *2 (7th Cir. Sept. 15, 2020) (citing <u>Farmer v. Brennan</u>, 511 U.S. 825, 834 (1994); <u>Petties v. Carter</u>, 836 F.3d 722, 728 (7th Cir. 2016)). "A medical need is sufficiently serious if the plaintiff's condition 'has been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would perceive the need for a doctor's attention.'" <u>Roe v. Elyea</u>, 631 F.3d 843 857 (7th Cir. 2011) (quoting <u>Greeno v. Daley</u>, 414 F.3d 645, 653 (7th Cir. 2005)). The condition does not need to be life-threatening to be serious; it needs only to be "a condition that would result in further significant injury or unnecessary and wanton infliction of pain" if not addressed. <u>Gayton v. McCoy</u>, 593 F.3d 610, 620 (7th Cir. 2010).

  A plaintiff must allege "that an official *actually* knew of and disregarded a substantial risk of harm." <u>Petties</u>, 836 F.3d at 728. The plaintiff also "must show more than mere evidence of malpractice." <u>Id.</u> The plaintiff must show that

10

the prison official's choices "were so 'significant a departure from accepted professional standards or practices' that it is questionable whether they actually exercised professional judgment." Stallings v. Liping Zhang, 607 F. App'x. 591, 593 (7th Cir. 2015) (quoting Pyles v. Fahim, 771 F.3d 403, 409 (7th Cir. 2014)). These choices include where a prison official fails to act or do anything to address the serious medical need. See Gayton, 593 F.3d at 623-624 (reversing summary judgment in favor of a nurse who refused to examine or treat a vomiting inmate). They also include where an official delays necessary treatment, aggravating a condition or needlessly prolonging a plaintiff's pain. Gomez v. Randle, 680 F.3d 859, 865-66 (7th Cir. 2012).

1. *The Non-Medical Defendants*

The defendants agree that the plaintiff's injuries were an objectively serious medical need, dkt. no. 44 at 8, so the court turns to whether the defendants were deliberately indifferent. The law authorized officer defendants Leighton, Olson, Glanzer and Crouther-Tole to defer to the judgment of the medical professionals. The Seventh Circuit has "long recognized that the division of labor within a prison necessitates that non-medical officials may reasonably defer to the judgment of medical professionals regarding inmate treatment." Giles v. Godinez, 914 F.3d 1040, 1049 (7th Cir. 2019). "If a prisoner is under the care of medical experts . . . a non-medical prison official will generally be justified in believing that the prisoner is in capable hands." Id. (internal quotations omitted). "[A]bsent a reason to believe (or actual

11

knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official . . . will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference." Id. at 1049-1050 (quoting Spruill v. Gillis, 372 F.3d 218, 236 (3d Cir. 2004)).

Immediately upon learning that the plaintiff fell, Glanzer notified his supervisor, Leighton, who contacted the HSU. Dkt. No. 45 at ¶8. At that point, Nurse Vaughn took over the plaintiff's care and Glanzer and Leighton reasonably deferred to her and the care plan she created with NP Chester. They were not obligated to overrule Vaughn's assessment and demand an ambulance for the plaintiff because officers do not have a duty to do anything more than secure medical care for an inmate. Giles, 914 F.3d at 1049-1050; See also Hayes v. Snyder, 546 F.3d 516, 527-528 (7th Cir. 2008). The plaintiff acknowledged in her deposition that the officers did not have the authority to call an ambulance and that they had to wait for authorization from HSU staff. Dkt. No. 56-2 at 7; Dep. Tr. 22:8-21. Other than contacting the HSU, there is nothing on the record to indicate that Leighton or Glanzer had any other interactions with the plaintiff or any obligation to check on her. Their shifts ended at 2:00 p.m., somewhere between two and three hours after the plaintiff's fall. Under the law, no reasonable factfinder could conclude that Glanzer and Leighton were deliberately indifferent to the plaintiff's medical needs.

Regarding defendant Crouther-Tole, the only interaction she had with the

12

plaintiff was to obtain the plaintiff's statement regarding the incident. The plaintiff admits that she did not tell Crouther-Tole that she was in pain, or that she needed more ice or more pain medicine. Dkt. No. 56-2 at 8; Dep. Tr. 25:8-10. In fact, the plaintiff testified that she had "no interest" in receiving more ice or more over-the-counter pain medicine. Id. at 9; Dep. Tr. 29:11-21. The plaintiff wanted to go to the hospital, and Crouther-Tole was entitled to defer to the authority of the HSU staff on that issue.

There is nothing in the record to indicate that defendant Olson had any interaction with the plaintiff on September 19, 2017, or had any knowledge that her condition had changed since Vaughn and Chester had set a care plan for the plaintiff. The record shows that Olson was aware of the plaintiff's fall and knew that HSU staff were waiting for an x-ray machine. Dkt. No. 45 at ¶¶21, 23. The plaintiff has not shown that Olson knew her condition had worsened or that she needed any care other than what she was receiving. Because no reasonable factfinder could conclude that Crouther-Tole or Olson had actual knowledge that the plaintiff wanted or needed more or different care than what she was receiving, no reasonable factfinder could hold them liable for deliberate indifference.

As for the allegations that when the MSDF staff decided to take the plaintiff to the hospital, they made her walk on her broken leg, the record does not indicate who forced the plaintiff to do that. Even taking the facts in a light most favorable to the plaintiff, there is no evidence indicating that it was any of

13

the defendants.

The court grants summary judgment in favor of Leighton, Olson, Glanzer and Crouther-Tole.

## 2. *The Medical Defendants*

The question the court must answer with regard to Nurse Vaughn, NP Chester and Dr. Kuber is whether their chosen course of treatment "was 'blatantly inappropriate.'" Pyles, 771 F.3d at 409 (quoting Greeno, 414 F.3d at 654). The Seventh Circuit has "emphasized the deference owed to the professional judgment of medical personnel." Zaya v. Sood, 836 F.3d 800, 805 (7th Cir. 2016). "By definition a treatment decision that's based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment." Id. "[I]f the defendant's chosen 'course of treatment' departs radically from 'accepted professional practice,' a jury may infer from the treatment decision itself that no exercise of professional judgment actually occurred." Id. (quoting Pyles, 771 F.3d at 409.)

Vaughn's care was not blatantly inappropriate. She performed the initial examination of the plaintiff. Dkt. No. 45 at ¶9. There was no allegation that she delayed in responding to Leighton's call; she came to the scene as soon as she was called. Id. During her examination, she noted that the plaintiff could move her knee, but that the knee was swollen and that the plaintiff could not put any weight on it. Id. at ¶11. At that point, she gave the plaintiff ice and

14

immobilized the knee by wrapping it in an ace bandage. Id. at ¶12.

The plaintiff states she told Vaughn that she knew her leg was broken and that she begged to go to the emergency room. Dkt. No. 56-2 at 4; Dep. Tr. 11:4-7. In other words, the plaintiff disagreed with Vaughn's treatment decision. Disagreement between a medical professional and a prisoner "about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." Pyles, 771 F.3d at 409. Before making any concrete treatment decisions, Vaughn consulted with Chester, who set the plan of care. Dkt. No. 45 at ¶14. A "medical care system requires nurses to defer to treating physicians' instructions and orders in most situations," although that deference "may not be blind or unthinking, particularly if it is apparent that the physician's order will likely harm the patient." See Berry v. Peterman, 604 F.3d 435, 443 (7th Cir. 2010). There is no evidence in the record that it was apparent that Chester's plan would harm the plaintiff.

After speaking with Vaughn, Chester determined that a trip to the emergency room was not necessary and opted to order an x-ray. Dkt. No. 45 at ¶15. His primary reason for this decision was because the plaintiff's injuries did not appear to be life-threatening. Id. This type of decision is a "classic example of a matter for medical judgment." Estelle, 429 U.S. at 107. See also West v. Matz, 740 F. App'x 103, 104 (7th Cir. 2018) (finding that decisions such whether to order x-rays or "additional diagnostic techniques or forms of treatment" are a matter of medical judgment.) Opting for x-rays over a trip to

15

the emergency room does not rise to the level of deliberate indifference.

The five-hour delay in treatment because the HSU staff had to wait for the x-ray vendor does not constitute deliberate indifference. The plaintiff had an x-ray as soon as it was practically and logistically possible. This is not like the situation in Conley v. Birch, 796 F.3d 742, 748 (7th Cir. 2015), where the medical professional determined that the inmate needed an x-ray, but because it was the Christmas holiday, delayed the x-ray until she was back at work thirteen days later. MSDF did not have an x-ray machine on site. There is nothing in the record indicating that Vaughn or Chester or other HSU or jail staff intentionally delayed the plaintiff's x-rays. Even outside the prison setting, short delays in obtaining x-rays or other diagnostic treatments happen. Neither Vaughn's nor Chester's course of action departed radically from acceptable courses of practice, and no reasonable factfinder could conclude otherwise. The court grants summary judgment in favor of Vaughn and Chester on this claim.

The court also grants summary judgment in favor of Dr. Kuber on this claim. Kuber was not involved until Rodriguez called him to review the plaintiff's x-rays, which came back the same day the plaintiff fell. Dkt. No. 45 at ¶27. Immediately upon determining that the plaintiff had fractures, Kuber authorized her to go to the hospital. Id. at ¶28. MSDF staff took the plaintiff to the hospital less than an hour later. Dkt. No. 56-2 at 4; Dep. Tr. 12:22-25. This course of action was the plaintiff's preferred treatment; no reasonable jury could conclude that Kuber was deliberately indifferent.

16

C.   Conditions of Confinement

The plaintiff also claims that the defendants violated her Eighth Amendment rights by denying her access to a bathroom, allowing her to soil herself and letting her sit in wet pants. "The Eighth Amendment can be violated by conditions of confinement in a jail or prison when (1) there is a deprivation that is, from an objective standpoint, sufficiently serious that it results 'in the denial of the minimal civilized measure of life's necessities' and (2) where prison officials are deliberately indifferent to this state of affairs." Gray, 826 F.3d at 1005 (quoting Farmer v. Brennan, 511 U.S. 825, 834 (1994)). "[F]acilities to wash and use the toilet are among the 'minimal civilized measure of life's necessities." Jaros v. Ill. Dept. of Corr., 684 F.3d 667, 671 (7th Cir. 2012) (quoting Rhodes v. Chapman, 452 U.S. 337, 347 (1981)).

The court cannot discern which, if any, of the defendants were personally involved in the alleged conditions of confinement claim. "To recover damages under §1983, a plaintiff must establish that a defendant was personally responsible for the deprivation of a constitutional right." Gentry v. Duckworth, 65 F.3d 555, 561 (7th Cir. 1995). There is nothing in the record to indicate that any of the named defendants knew that the plaintiff needed to use the bathroom or had soiled herself. In her deposition, the plaintiff testified that she told the person who escorted her to HSU for x-rays that her pants were wet. Dkt. No. 56-2 at 11; Dep. Tr. 38:7-17. Nothing in the record identifies the person to whom she made this statement or indicates that it was one of the

17

defendants. The plaintiff also testified that she did not tell the officers her pants were wet. Id.; Dep. Tr. 39:4-7.

Even if the plaintiff had told a member of the staff that she needed to use the restroom, or that her pants were wet, a plaintiff must demonstrate that as a result of the conditions of confinement, she "suffered some cognizable harm from the overall lack of a sanitary environment, and that the [prison official's] deliberate indifference caused that harm." Gray, 826 F.3d at 1006. The plaintiff admitted that informing any of the officers "would have been useless" because she couldn't get her pants off anyway. Dkt. No. 56-2 at 11; Dep. Tr. 39:4-7. This suggests that she was not harmed. While sitting soiled pants doubtless was uncomfortable and embarrassing, it was not a condition that rises to the level of the "extreme deprivations [that] are required to make out a conditions-of-confinement claim." Turner v. Miller, 301 F.3d 599, 603 (7th Cir. 2002) (citations and quotations omitted). See also Sain v. Wood, 512 F.3d 886, 894 (7th Cir. 2008) (finding that while prison life may be "certainly unpleasant", those unpleasant conditions do not rise to the level of a constitutional violation.)

No reasonable factfinder could conclude than any of the defendants were personally involved with this claim or acted with deliberate indifference to the plaintiff's need to use the bathroom or her soiled pants. The court grants summary judgment in favor of all of the defendants on the conditions-of-confinement claim.

18

### D. Wisconsin State Negligence Claim

At screening, the court exercised supplemental jurisdiction over the plaintiff's state-law negligence claim. Section 1367(c)(3) of Title 28 gives a district court the discretion to decline to exercise supplemental jurisdiction over a claim in, among other things, "the district court has dismissed all claims over which it has original jurisdiction." Because the court has granted summary judgment in favor of defendants and dismissed the federal claims, the court declines to continue to exercise that jurisdiction over the remaining state-law negligence claim.

## III. Conclusion

The court **GRANTS** the defendants' motion for summary judgment Dkt. No. 43.

The court **DISMISSES** this case and will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. See Federal Rule of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. See Federal Rule of Appellate Procedure 4(a)(5)(A).

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for

19

relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. See Federal Rule of Civil Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. See Federal Rule of Civil Procedure 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 25th day of September, 2020.

**BY THE COURT:**

_____
**HON. PAMELA PEPPER**
**Chief United States District Judge**